OPINION OF THE COURT
Edward H. Lehner, J.
The novel legal issue presented on this motion by defendant 288 Kiseki Realty, Inc. (Kiseki) to dismiss the complaint is whether a power of attorney given by the sole shareholder, *360 director and officer of Kiseki to his mother grants her authority, under the provision of General Obligations Law § 5-1502E, to execute a contract for the sale of real property owned by the corporation.
Facts
Shi Hwan Kim was the sole shareholder, director and officer of Kiseki, which owned the property located at 288 St. Nicholas Avenue (the Property). On April 5, 1999 he executed a general power of attorney in favor of his mother, Kil Soon Cha. In the instrument he initialed each of the powers listed in General Obligations Law § 5-1501.
In the late summer of 1999, Kim retained an attorney, Seyun Bach, to prepare a contract for a proposed sale of the Property. At his initial meeting with Bach, Kim was accompanied by his mother, who apparently was experienced in dealing with real estate. However, the contemplated transaction was not consummated. Kim then left for Asia. Thereafter, Cha requested Bach to prepare a contract for the sale of the Property to the plaintiff herein for the sum of $3,300,000. The contract was executed at a closing held on November 5, 1999, at which Cha signed on behalf of Kiseki, as attorney-in-fact for Kim. Both Bach and plaintiff’s attorney apparently believed that the aforesaid power of attorney authorized Cha to bind Kiseki. Paragraph 20 of the rider to the contract provided: “Seller represents that Kil Soon Cha has the authority to execute this Contract of Sale on behalf of 288 Kiseki Realty, Inc. and that the Board of Directors of 288 Kiseki Realty, Inc. has approved the sale.”
While Fred Harari has submitted an affidavit on behalf of plaintiff asserting that in his presence Cha called Kim to communicate some of the terms of the contract and get his approval therefor, Kim denies he knew anything of the contract execution until mid-November. In his affidavit, Bach states that upon learning of the transaction, Kim “became angry and told me (a) that he [that is Kiseki] had not approved that transaction, objected to the sale, and did not want to sell the Property, and (b) to rectify the situation.” Further, Harari[1] asserted that Cha told him that her son did not want the responsibility *361 of evicting one of the tenants. Consequently a side agreement was executed (again Cha signing on behalf of Kiseki as attorney-in-fact for her son) in which the plaintiff agreed to remove the specified tenant.[2]
Notwithstanding Bach’s asserted mid-November conversation with Kim, no attempt was made in any way to terminate the contract until January 19, 2000 when Bach wrote to plaintiffs attorney stating that Kiseki elected to cancel the agreement because it was conditioned upon plaintiff obtaining a mortgage commitment by January 15, 2000 in the sum of $2,200,000, and no proof of such commitment had been sent. Such basis for termination was rejected by plaintiff’s counsel, who pointed out that the contractual provision for termination was at the option of the plaintiff buyer and that a provision allowing the defendant seller to cancel if a mortgage commitment was not timely obtained was stricken from the agreement. Plaintiffs attorney subsequently sought to arrange for a closing date. However, by letter dated February 25, 2000 from new counsel, who are now representing defendant in this action, defendant for the first time asserted that the contract is unenforceable under the Statute of Frauds because the power of attorney did not authorize Cha to act on behalf of Kiseki.
Thereafter, this action was commenced in which plaintiff seeks specific performance. Before me are defendant’s motion to dismiss pursuant to CPLR 3211 (a) (1), (5) and (7), and a cross motion by plaintiff for summary judgment.
Discussion
General Obligations Law § 5-703 (2) provides that a contract for the sale of real property is void unless it “is in writing, subscribed by the party to be charged, or by his lawful agent thereunto authorized by writing.” Thus, if the contract were for the sale of property owned by Kim personally, the power of attorney to Cha which authorizes her to act in “real estate transactions” would clearly be sufficient authority for her to execute a contract binding upon Kim. (See, General Obligations Law § 5-1502A.)
However, normally a power of attorney executed by an individual would not in itself authorize the agent to act on behalf of the principal in the principal’s corporate capacity. But where, as here, the principal initials the power granting the agent *362 authority in “business operating transactions,” subdivision (3) of General Obligations Law § 5-1502E provides that this gives the agent broad powers “[w]ith respect to any business enterprise which is owned solely by the principal.”
Although the General Obligations Law does not define the term “business enterprise,” other statutory provisions where such term is used define it to include a corporation (e.g., Economic Development Law §§ 141, 210; General Municipal Law § 957 [g]). In light of (i) the definition of the term when employed in such other statutes, (ii) the fact that under common usage a corporation would be considered a business enterprise, and (iii) the wording of the statute from which there is nothing to evidence a legislative intent to exclude a corporation from the meaning thereof, I find that the term includes corporations.
Said subdivision (3) of General Obligations Law § 5-1502E provides that the power granted to an agent with respect to “business operating transactions” authorizes the agent with “respect to any business enterprise solely owned by the principal”:
“a. to continue, to modify, to renegotiate, to extend and to terminate any contractual arrangements made with any person, firm, association or corporation whatsoever by or on behalf of the principal with respect thereto prior to the creation of the agency;
“b. to determine the policy of such enterprise as to the location of the site or sites to be utilized for its operation, as to the nature and extent of the business to be undertaken by it, as to methods of manufacturing, selling, merchandising, financing, accounting and advertising to be employed in its operation, as to the amount and types of insurance to be carried, as to the mode of securing, compensating and dealing with accountants, attorneys, servants and other agents and employees required for its operation, to agree and to contract, in any manner, and with any person and on any terms, which the agent thinks to be desirable or necessary for effectuating any or all of such decisions of the agent as to policy, and to perform, to rescind, to reform, to release or to modify and such agreement or contract or any other similar agreement or contract made by or on behalf of the principal;
“c. to change the name or form of organization under which such business is operated and to enter into such partnership agreement with other persons or to organize such corporation to take over the operation of such business, or any part thereof, as the agent shall think to be desirable or necessary;
*363 “d. to demand and to receive all moneys which are, or may become, due to the principal, or which may be claimed by the principal or on his behalf, in the operation of such enterprise, and to control and to disburse such funds in the operation of such enterprise in any way which the agent shall think to be desirable or necessary, to engage in any banking transactions which the agent shall think to be desirable or necessary for effectuating the execution of any of the powers of the agent described in this subdivision.”
Subdivisions (7) and (10) of the section further provide:
“7. To execute, to acknowledge, to seal and to deliver any deed, assignment, mortgage, lease, notice, consent, agreement, authorization, check or other instrument which the agent may think useful for the accomplishment of any of the purposes enumerated in this section * * *
“10. In general, and in addition to all the specific acts in this section enumerated, to do any other act or acts, which the principal can do through an agent, in connection with any business operated by the principal, which the agent shall think to be desirable or necessary for the furtherance or protection of the interests of the principal.”
While defendant asserts that since the provisions of subdivision (3) do not specifically mention real estate transactions they exclude authority with respect to realty, it is evident that the powers granted to an agent under the aforequoted subdivisions are vast and, in essence, authorize the agent to make all decisions with respect to a business which could have been made by the principal. Specifically, the power of the agent specified in paragraph (b) of subdivision (3) “to agree and to contract, in any manner, and with any person and on any terms” to effectuate the decisions of the agent with respect to the operation of the business could hardly be any broader, and it would be unreasonable to expect the statute to detail each specific type of transaction which the agent may enter into in the exercise of such broad authority.
In this connection, it has been held that the statutory provisions relating to powers of attorney should be liberally construed. In Matter of Arens v Shainswit (37 AD2d 274, 279 [1st Dept 1971], affd on opn below 29 NY2d 663 [1971]), it was stated that the “General Obligations Law codifies as the public policy of this State that there be liberal use and judicial recognition of the efficacy of powers of attorney.” In that case the Court held valid the use of a power of attorney on behalf of a judicial candidate to accept a political party’s nomination for elective office.
*364 While a statute that permits a person acting under a power of attorney to act for the principal in his corporate capacity may be contrary to general corporate principles, under which corporations are treated as separate and distinct entities from the controlling shareholders and officers have designated powers, it is noted that courts have at times treated closely held corporations in a special manner and overlooked certain formalities (e.g., Leslie, Semple & Garrison v Gavit & Co., 81 AD2d 950, 951 [3d Dept 1981] [“in the management and affairs of a family corporation, irregularities not directly harmful in their nature will be overlooked, and invalidity will not be sought if the declaration of illegality could work injustice”]; Matter of Bahar v Schwartzreich, 204 AD2d 441 [2d Dept 1994]; Matter of Bullard v Bullard, 185 AD2d 411 [3d Dept 1992]; Roos v Aloi, 127 Misc 2d 864 [Sup Ct, Nassau County 1985]).
While, as argued by defendant, Kim could have made Cha a corporate officer and thus avoided the Statute of Frauds issue raised herein, there well may be personal reasons why that was not done. Moreover, even if Cha were an officer, there still could be raised an issue as to whether she had the authority from the Board of Directors to execute the contract of sale.
Thus, I find that the power of attorney given by Kim authorized Cha to execute the contract on behalf of Kim as president of Kiseki. Accordingly, defendant’s motion to dismiss is denied.
Plaintiffs cross motion for summary judgment is denied as premature, having been made prior to joinder of issue. (See, CPLR 3212 [a].) Moreover, there appears to be a triable issue as to whether Pauline Harari, the person whose signature appears on the contract as a member of the plaintiff limited liability company, actually signed the agreement.

. Defendant has submitted a newspaper story from the Ainerstam News and other material denigrating Mr. Harari, whose store (Freddy’s Fashion Mart) on 125th Street was fire bombed in 1996 in an apparent racial attack during which several people were killed. I find that none of such material is in any way relevant to the issues before me.

. No explanation is offered as to what legal basis a contract vendee would have to evict a tenant.